Exhibit L

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES ) | |
| ) | |
| v.   ) | M.J. No. |
| ) | 13-mj-1133-RBC-1 |
| ARTIS COOPER, ) | -2 |
|    a/k/a "Junior"; and  ) | |
| ) | |
| JERRY COOPER, ) | |
|    a/k/a "Baby," ) | |
| ) | |
|    Defendants. ) | |

## AFFIDAVIT OF SPECIAL AGENT BRIAN HIGGINS

I, Brian Higgins, Special Agent with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, depose and state as follows:

1. I have been employed as Special Agent with the ATF since 2009. I am currently assigned to the Boston II Field Office. Prior to joining the ATF, I was a lieutenant with the Cambridge, Massachusetts Fire Department, where I was assigned to the fire investigation unit and was responsible for investigating all fires and explosions.

2. I am a graduate of the ATF National Academy and the Criminal Investigator School located at the Federal Law Enforcement Training Center in Glynco, Georgia. I also am a graduate of the MBTA Municipal Police Academy, which I attended when I was employed by the Cambridge Fire Department. During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics-trafficking activities.

3.      In addition to my training, I have gained extensive experience in the investigation of the activities of narcotics traffickers. I have participated in numerous narcotics investigations, and I have assisted in complex narcotics and firearms investigations. I have debriefed numerous defendants, informants, and witnesses with personal knowledge about narcotics-trafficking activities and the operation of narcotics-trafficking organizations. I personally have participated in most aspects of narcotics-trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and executing search warrants.

4.      I am aware that drug traffickers use residences as "stash locations" for their drugs, drug-proceeds, drug-trafficking related documents, including drug ledgers, phone records, customer lists, photographs of themselves and their criminal associates, receipts, business cards, and other items used in furtherance of their narcotics-trafficking activities. In a substantial number of residential and storage location searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered: (a) controlled substances, such as cocaine, cocaine base, marijuana, and heroin; (b) paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances; (c) books, receipts, notes, ledgers, and other records relating to the distribution of controlled substances, including such records stored electronically on devices; (d) personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to individuals involved in the distribution of controlled substances; (e) cash, currency, and records relating to proceeds from the sale of controlled substances and the expenditure of money, and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, and checkbooks; (f) specially manufactured hidden compartments

known as "hides" that are used to store drugs and drug proceeds; and (g) firearms and other dangerous weapons.

5.  I submit this affidavit in support of a Criminal Complaint charging Artis COOPER and Jerry COOPER with violating Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute a controlled substance, to wit cocaine base).

6.  I have personally participated in the investigation into Artis COOPER and Jerry COOPER's drug trafficking activities since approximately March 2013. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by other agents of the ATF and other federal, state, and local law enforcement agencies. I have also reviewed information from a variety of additional sources, including a cooperating witness, physical surveillance, public records, and numerous databases.

7.  This affidavit is submitted for the limited purpose of establishing probable cause to believe that Artis COOPER and Jerry COOPER have committed the above offense. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

### Background of Investigation

8.  The investigation to date has established that Artis COOPER a/k/a "Junior," Jerry COOPER a/k/a "Baby," and their associates, including Jerry COOPER's daughter and brother, among others, are distributing cocaine base, also known as crack cocaine, in Boston and Roxbury, Massachusetts. As described in more detail below, a cooperating witness acting at the

direction of agents has made numerous controlled purchases of crack cocaine from Jerry COOPER and his associates.

9.      Furthermore, on May 20, 2013, agents recovered approximately 304 grams of crack cocaine from a vehicle driven by Artis COOPER. That same day, agents executed a federal search warrant at Artis COOPER's residence at 4 Westminster Avenue, Roxbury, Massachusetts. From the residence, agents recovered additional crack cocaine, United States currency, and drug distribution paraphernalia.

### Controlled Purchases of Crack Cocaine from Jerry COOPER and Artis COOPER

10.     Since March 2013, agents have made eight controlled purchases of crack cocaine from Jerry COOPER and his associates. These controlled purchases of crack cocaine have been conducted by a cooperating witness (the "CW"). The CW wishes to remain anonymous out of concern for the CW's safety and that of the CW's family. The CW is cooperating with law enforcement in exchange for monetary compensation. The CW has a prior criminal record that includes convictions for theft-related crimes and trespass, as well as multiple other arrests, including for a drug offense. Information provided by the CW has been independently corroborated by law enforcement agents. The CW is believed to be reliable.

11.     During an interview in March 2013, the CW stated that the CW has known Artis COOPER and Jerry COOPER for several years. The CW subsequently identified Artis COOPER and Jerry COOPER by photograph and by nickname. The CW told investigators that the CW had purchased crack cocaine from Artis COOPER and Jerry COOPER on several occasions. The CW further stated that based on the CW's observations, as well as conversations with Artis COOPER and Jerry COOPER, Artis COOPER, Jerry COOPER, and James Cooper (Jerry COOPER's brother) work together to distribute drugs. Specifically, the CW stated that

Jerry COOPER works as a drug runner for Artis COOPER, conducting drug transactions on his behalf. The CW also stated that Jerry COOPER has customers of his own who he provides with crack cocaine obtained from Artis COOPER, and that James Cooper works as a drug runner for Jerry COOPER.

<u>During the Week of March 18, 2013,[1] the CW Made a Controlled Purchase of Crack Cocaine from Jerry COOPER and Artis COOPER.</u>

12.     During the week of March 18, 2013, at the direction of agents, the CW made arrangements to purchase crack cocaine from Jerry COOPER. These arrangements were made by way of consensually intercepted telephone calls. The CW initially spoke several times to Jerry COOPER. During one of the intercepted calls, Jerry COOPER stated, "Let me call him one more time because he ain't answer his cell." During a subsequent call, Jerry COOPER stated, "He ain't answering me. He must be busy." The CW requested Artis COOPER's telephone number, which Jerry COOPER provided.

13.     The CW then called Artis COOPER's telephone and left a message. Artis COOPER returned the CW's call and stated that he was not at home. The CW asked when Artis COOPER would be back because the CW "needed something," meaning crack cocaine. Artis COOPER stated that he would call the CW on his way back home. The CW asked Artis COOPER if the CW could meet him somewhere, and Artis COOPER stated, "I don't travel like that. That is one thing I do not do." Artis COOPER then agreed to call the CW when he returned home.

14.     Later in the day, Artis COOPER called the CW on two occasions, but the CW missed the calls. The CW then attempted to call Artis COOPER twice, but Artis COOPER did not answer the telephone. The CW subsequently spoke briefly with Artis COOPER, who said he

---

[1] The exact dates of controlled purchases are withheld in an attempt to protect the CW's identity.

would call the CW later. The CW then spoke with Jerry COOPER several times. During one of the calls, Jerry COOPER stated, "He said he's going to hit me when he gets back." Jerry COOPER further stated, "I am going to manage it for you." During the last call, Jerry COOPER instructed the CW to meet him at 13 Winthrop Street, Boston, Massachusetts. Based on my training and experience, as well as my familiarity with this investigation, I believe that Jerry COOPER informed the CW that Artis COOPER would call Jerry COOPER when he returned home, and that Jerry COOPER was going to complete the drug transaction with the CW.

15. Prior to meeting with Jerry COOPER, the CW and the CW's vehicle were searched for contraband with negative results.[2] The CW's vehicle was outfitted with an electronic monitoring device, and the CW was provided with government funds, the serial numbers of which had previously been recorded. The CW was then instructed to travel to 13 Winthrop Street, Boston, Massachusetts, to meet with Jerry COOPER. Agents maintained surveillance of the CW as the CW traveled to meet Jerry COOPER.

16. After the CW arrived at 13 Winthrop Street, agents observed Jerry COOPER arrive in another vehicle, which he exited, and enter the CW's vehicle. At that time, Jerry COOPER sold the CW crack cocaine. After the transaction was completed, Jerry COOPER exited the CW's vehicle and entered 13 Winthrop Street.

17. The CW subsequently met with agents, who again searched the CW and the CW's vehicle for contraband with negative results. The crack cocaine the CW purchased from Jerry COOPER field tested positive for the presence of cocaine.

<u>During the Week of April 1, 2013, the CW Made a Controlled Purchase of Crack Cocaine from Jerry COOPER Outside of 4 Westminster Avenue, Roxbury, Massachusetts.</u>

---

[2] The procedure described herein was followed for each of the controlled purchases of crack cocaine conducted by the CW. It is not recounted in describing subsequent controlled purchases.

6

18.  During the week of April 1, 2013, at the direction of agents, the CW made arrangements to purchase crack cocaine from Jerry COOPER. Jerry COOPER instructed the CW to meet him at his residence, and that they would then travel to Artis COOPER's house, which is 4 Westminster Avenue, Roxbury, Massachusetts.

19.  The CW traveled to Jerry COOPER's residence, as instructed, and agents observed Jerry COOPER exit the residence and enter the CW's vehicle. The CW and Jerry COOPER then traveled, under constant surveillance, to 4 Westminster Avenue. Once they arrived at 4 Westminster Avenue, the CW handed payment for the cocaine to Jerry COOPER. Jerry COOPER then exited the CW's car and entered 4 Westminster Avenue. A short time later, agents observed Jerry COOPER exit 4 Westminster Avenue with Artis COOPER. Artis COOPER immediately left the area in a small black car. Jerry COOPER re-entered the CW's vehicle and handed the CW a quantity of crack cocaine. The crack cocaine the CW purchased from Jerry COOPER field tested positive for the presence of cocaine.

<u>During the Week of April 1, 2013, the CW Made a Second Controlled Purchase of Crack Cocaine Outside of 4 Westminster Avenue, Roxbury, Massachusetts.</u>

20.  Later during the week of April 1, 2013, at the direction of agents, the CW made arrangements to purchase more crack cocaine from Jerry COOPER. Jerry COOPER told the CW to meet him at his residence, and that they would then travel to Artis COOPER's house, which is 4 Westminster Avenue.

21.  The CW traveled to Jerry COOPER's residence, as instructed, and agents observed Jerry COOPER exit the residence and enter the CW's vehicle. The CW and Jerry COOPER then traveled, under constant surveillance, to 4 Westminster Avenue. While the CW and Jerry COOPER were en route to 4 Westminster Avenue, Artis COOPER arrived at 4 Westminster Avenue and waited outside the residence. When the CW and Jerry COOPER

arrived at 4 Westminster Avenue, the CW handed payment for the cocaine to Jerry COOPER. Jerry COOPER then exited the CW's car, met with Artis COOPER on the front porch of 4 Westminster Avenue, and entered the residence. A short time later, agents observed Jerry COOPER exit 4 Westminster Avenue. Jerry COOPER re-entered the CW's vehicle and handed the CW a quantity of crack cocaine. The crack cocaine the CW purchased from Jerry COOPER field tested positive for the presence of cocaine.

### During the Week of April 29, 2013, the CW Made a Controlled Purchase of Crack Cocaine Outside of 4 Westminster Avenue.

22. During the week of April 29, 2013, at the direction of agents, the CW made arrangements with Jerry COOPER to purchase crack cocaine. Jerry COOPER instructed the CW to meet him at his residence. While the CW was speaking with Jerry COOPER, agents observed Artis COOPER exit 4 Westminster Avenue and leave the area.

23. The CW traveled to Jerry COOPER's residence, as instructed, and agents observed Jerry COOPER exit the residence and enter the CW's vehicle. The CW and Jerry COOPER then traveled, under constant surveillance, to 4 Westminster Avenue. While the CW and Jerry COOPER were en route to 4 Westminster Avenue, Artis COOPER arrived at 4 Westminster Avenue and entered the residence. When the CW and Jerry COOPER arrived at 4 Westminster Avenue, the CW handed payment for the cocaine to Jerry COOPER. Jerry COOPER then exited the CW's car and entered 4 Westminster Avenue. A short time later, agents observed Jerry COOPER and a male matching the description of Artis COOPER exit 4 Westminster Avenue. The male resembling Artis COOPER then entered the vehicle Artis COOPER had been operating earlier and left the area. Jerry COOPER re-entered the CW's vehicle and handed the CW a quantity of crack cocaine.

24. At that time, the CW drove Jerry COOPER to 13 Winthrop Street, Boston, Massachusetts. By way of video surveillance, agents observed that during the drive to 13 Winthrop Street, Jerry COOPER was packaging additional quantities of crack cocaine for distribution. In addition, the audio recording from inside the CW's vehicle revealed that during the drive Jerry COOPER made and/or received one or more telephone calls during which he instructed the person he was speaking to to meet him at a particular location and to "have that money ready." Based on my training and experience, I believe that during this/these call(s), Jerry COOPER was making arrangements to meet other drug customers to deliver crack cocaine.

25. When the CW arrived at 13 Winthrop Street, Jerry COOPER exited the CW's vehicle and entered the residence. The crack cocaine the CW purchased from Jerry COOPER field tested positive for the presence of cocaine.

### Seizure of Approximately 304 Grams of Crack Cocaine from Artis COOPER.

36. On May 20, 2013, at the direction of agents, the CW contacted Jerry COOPER about purchasing crack cocaine. Over the course of the day, the CW and Jerry COOPER made and revised arrangements for the CW to receive the crack cocaine. Jerry COOPER told the CW that "he," referring to a third-party, needed to "go to the lab," and then clarified that he meant "the kitchen." Based on my training and experience, as well as my familiarity with this investigation, I believe that Jerry COOPER meant that a third party needed to process a batch of crack cocaine for distribution before Jerry COOPER could deliver the crack cocaine to the CW. I further believe, based on information provided by the CW and my familiarity with this investigation, that Jerry COOPER was waiting for Artis COOPER to retrieve the processed cocaine.

37. Based on recorded calls between the CW and Jerry COOPER and information

provided by the CW, on May 20, 2013, agents approached a vehicle driven by Artis COOPER as it parked outside Artis COOPER's residence at 4 Westminster Avenue. After directing Artis COOPER and his passenger, Melody Pearson, to exit the vehicle, agents observed a bag on the floor in front of the front passenger seat that contained approximately 304 grams of a substance that I believe, based on my training and experience, to be crack cocaine. That substance field tested positive for the presence of cocaine.

38. Agents spoke with Pearson, who stated that the bag containing the crack cocaine did not belong to her. She stated that Artis COOPER had just picked her up from her job at Stop 'n Shop, and that as per standard procedure, her belongings had been searched by security staff of the Stop 'n Shop before she left.

39. After receiving his <u>Miranda</u> warnings, Artis COOPER stated that the bag containing the crack cocaine did not belong to Pearson. Artis COOPER did not offer any other information as to the ownership of the bag.

40. Jerry COOPER arrived at 4 Westminster Avenue immediately prior to Artis COOPER's arrival. Jerry COOPER was detained by agents. After receiving his <u>Miranda</u> warnings, Jerry COOPER stated that he had traveled to 4 Westminster Avenue that evening to pick up a "package" containing one ounce of crack cocaine from Artis COOPER. Jerry COOPER stated that he was to pay Artis COOPER $1,100 for the ounce of crack cocaine, which he was intending to re-distribute to a customer for $1,600. Jerry COOPER stated that he had intended to go inside 4 Westminster Avenue with Artis COOPER to package one ounce of a larger quantity of crack cocaine for distribution.

41. Jerry COOPER further stated the following: Artis COOPER has supplied him with crack cocaine for the past year. Jerry COOPER typically travels to 4 Westminster Avenue

to retrieve the crack cocaine from Artis COOPER. Jerry COOPER and Artis COOPER typically repackage crack cocaine for distribution at a kitchen table on the first floor of 4 Westminster Avenue. Jerry COOPER regularly sells crack cocaine from his residence at 8 Dewey Street, Dorchester, Massachusetts, and usually conducts transactions outside of his residence. James Cooper, Jerry COOPER's brother, has sold crack cocaine on Jerry COOPER's behalf.

### Execution of Federal Search Warrant at 4 Westminster Avenue, Roxbury, Massachusetts

42. On May 9, 2013, the Honorable Robert B. Collings issued a search warrant authorizing agents to search 4 Westminster Avenue, Roxbury, Massachusetts, for evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846. (M.J. No. 13-1112-RBC).

43. On May 20, 2013, ATF agents executed the search warrant at 4 Westminster Avenue. Agents recovered drugs, currency, and drug distribution paraphernalia from a bedroom believed to be used by Artis COOPER. 4 Westminster Avenue is occupied by Artis COOPER and Olive Moore, an older family friend. Moore identified the second-floor, right, rear bedroom as Artis COOPER's.

44. From a pillow case in the bedroom identified by Moore, agents recovered approximately six grams of a white rock-like substance that I believe, based on my training and experience, is crack cocaine. The pillow case also contained an as yet undetermined amount of U.S. currency, as well as personal papers in the name of Artis COOPER. From inside the mattress pad of the bed, agents recovered a bag containing cut-off plastic baggies, an as yet undetermined amount of U.S. currency, and approximately 26 grams of a white, rock-like substance that I believe, based on my training and experience, is crack cocaine. From under the bed, agents recovered a plastic bag containing approximately 4.5 grams of a white, rock-like

substance that I believe, based on my training and experience, is crack cocaine.

45. From various other locations inside the bedroom, agents recovered two digital scales, a box of sandwich bags, latex gloves, razor blades, a sifter, and a respirator. Based on my training and experience, I believe that these items are used in the processing and packaging of crack cocaine for distribution. Agents also recovered an as yet undetermined quantity of U.S. currency from a closet in the bedroom.

## Conclusion

42. Based upon the foregoing, there is probable cause to believe that from on or about March 18, 2013, until May 20, 2013, Artis COOPER and Jerry COOPER did knowingly and intentionally combine, conspire, confederate, and agree, with each other and with other persons known and unknown, to possess with intent to distribute, and to distribute, 280 grams or more of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

Brian Higgins
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me this 21st day of May 2013

Hon. Robert B. Collings
United States Magistrate Judge
District of Massachusetts

HON. ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
United States District Court
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 7420
Boston, Massachusetts 02210